**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

GLEN PERKINS,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      Civil Action No. 11-85 (GK)
                                       )
DAVITA VANCE-COOKS, ACTING             )
PUBLIC PRINTER, U.S.                   )
GOVERNMENT PRINTING OFFICE,            )
                                       )
            Defendant.                 )
                                       )

---

<u>**MEMORANDUM OPINION**</u>

Plaintiff Glen Perkins, an employee of the United States Government Printing Office, brings this suit against Defendant Davita Vance-Cooks[1] in her official capacity as Acting Public Printer. The Complaint alleges that Defendant engaged in unlawful retaliation against Perkins in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et seq.</u> This matter is now before the Court on Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Def.'s Mot.") [Dkt. Nos. 13, 14] pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons set forth below, the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is **granted.**

---

[1]     Pursuant to Fed. R. Civ. P. 25(d), Acting Public Printer Davita Vance-Cooks is automatically substituted as Defendant for former Public Printer William Boarman.

## I.    Background[2]

Plaintiff Glen Perkins, an African-American male, has worked for the United States Government Printing Office ("GPO") since 2002. He has held several positions during this period, beginning as a Mail Clerk in the Office of Congressional Publishing Services ("CPS"), and eventually being promoted to Receiving Clerk at GPO. Perkins claims that his superiors at GPO have taken actions against him in retaliation for his prior Equal Employment Opportunity ("EEO") complaint, which was settled out of court in 2009.

### A.    The 2009 Settlement Agreement

According to Perkins, his trouble at GPO began in or around 2008, when his immediate supervisor retired and was replaced by someone from outside the office. Perkins Decl. ¶¶ 4-6 [Dkt. No. 20-3]. After the new supervisor was selected, Perkins refused to join two of his coworkers in an effort to undermine the supervisor's authority. Id. ¶ 7. Thereafter, the two coworkers began harassing and physically threatening Perkins. Id. ¶ 9. One of the coworkers, Lyndon Ross, referred to Perkins using racial and sexual epithets. Id. ¶ 8. Perkins eventually reported this conduct to the police,

---

[2]    Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h).

and the coworkers were arrested and "ultimately convicted of felonious threats."[3] Id. ¶ 12.

Subsequently, Perkins filed a complaint with GPO's EEO Office. On April 24, 2009, he entered into an out-of-court settlement with GPO. Def.'s Mot. Ex. 7 ("2009 Settlement Agreement") ¶ 5 [Dkt. No. 13-1]. Perkins received a promotion, a lump sum payment of $20,000, a payment representing the difference in pay (the "night time pay differential") between his previous position and the new position he was required to take to separate him from the two coworkers, and $6,000 for attorney's fees and costs. Id. ¶¶ 1-4. Perkins claims, though Defendant denies, that he was never paid the night time pay differential. See Pl.'s Statement of Undisputed Material Facts ¶ 10 [Dkt. No. 20-1]; Def.'s Reply 6-7 [Dkt. No. 23].

**B.   The Current Civil Action**

As a result of the settlement agreement, Perkins was promoted to "Receiving Clerk" on April 26, 2009. Since that time, his supervisors have included Randy Wilson, an African-American male, Sheron Minter, an African-American female, Gregory Estep, a male whose ethnicity has not been identified, and Lyle Green, a Caucasian male. His duties primarily consist of receiving and delivering GPO products to United States House of Representatives and Senate offices on Capitol Hill.

_____

[3]     According to Defendant, Ross was found guilty of a misdemeanor, "Attempted Threats to Do Bodily Harm." Def.'s Statement of Undisputed Material Facts 6 n.2.

Perkins now claims that his superiors at GPO have engaged in retaliatory conduct. He points to a number of incidents which he claims were retaliatory or, taken together, amount to a hostile work environment. Because the parties disagree as to many of the details of these incidents, the events will be only briefly described below.

### 1.   May 7, 2009, Annual Budget Distribution

On May 7, 2009, Perkins, along with Minter and Wilson, delivered President Barack Obama's first budget to the House of Representatives Budget Committee. Perkins was operating an electric jack. Although the manner and tone Perkins used is in dispute, it is clear that, in one way or another, he asked Minter and Wilson to move out of the way of the jack because he feared it was going to injure them. Later that day and during a subsequent meeting, Wilson chastised Perkins for the way he spoke to him and Minter. According to Perkins, he was never given a chance to explain his behavior.

### 2.   May 18, 2009, Orientation

On May 18, 2009, Perkins' supervisors held an orientation meeting for him. According to Perkins, not every employee who comes to CPS on Capitol Hill is required to attend such a meeting and the purpose of the meeting was to harass him. Defendant vigorously denied this allegation and states that attendance at an orientation meeting is a common practice.

### 3.    Assignment to Work Location Without Assistance

After Perkins' training was completed, he was assigned to the Cannon House Office Building. According to Perkins, he was the only clerk assigned to that work location, even though prior to his tenure and after he left, two clerks were assigned to do that work.

### 4.    June 3, 2009, Incident with Lyndon Ross

According to Perkins, on June 3, 2009, he was standing between the Longworth and Cannon House Office Buildings when Lyndon Ross drove by, stuck out his tongue, and pointed at him in a manner that resembled the pointing of a gun. Perkins reported the incident to GPO's human resources office the next day. He claims that "his supervisors allowed Ross to appear on Capital [sic] Hill to intimidate [him] in the hope [that he] would leave his job." Pl.'s Statement of Undisputed Material Facts ¶ 33.

GPO investigated the incident and determined that Ross had a legitimate reason to be on Capitol Hill, that Ross had no access to information about Perkins' whereabouts, and that the evidence did not support Perkins' allegations. Perkins denies that GPO conducted a fair investigation.

### 5.    Humiliation During Receiving Clerks Meeting

At some time during his tenure as a receiving clerk, Perkins attended a receiving clerks meeting led by Estep. According to Perkins, Estep stated that "some people were going outside of GPO

for problems that are GPO problems." Perkins felt that this comment was directed at him.

### 6.   July 7, 2009, Incident Regarding Delivery Receipt

On July 7, 2009, Perkins made a delivery but failed to obtain a receipt. Perkins claims that although he failed to get a receipt at the time of delivery, he did get one before the end of the day. Wilson later contacted Perkins to remind him that it was GPO's policy not to deliver any work without a receipt. According to Defendant, Perkins responded in a loud and rude manner. On July 9, 2009, Wilson and Estep met with Perkins and told him that was not being reprimanded, but that he should display professional behavior toward his superiors.

### 7.   October 16, 2009, Incident with Marsha Douglas

On October 16, 2009, Perkins made a delivery to Marsha Douglas, Chief Administrator for the House of Representatives Budget Committee. Although the specifics of their interaction are in dispute, it is clear that, later that day, Douglas called Andrew Sherman, Director of GPO's Office of Congressional Relations, to complain about Perkins' rude behavior. Perkins was subsequently transferred to other Congressional offices so that he would not have further conduct with Douglas and, on November 12, 2009, was given a Letter of Warning ("LOW") for his conduct. Perkins filed a grievance with his union over the LOW, but the union did not invoke

arbitration within 30 days and the grievance was closed for failure to proceed.

### 8. March 11, 2010, "Sleeping" Incident

On March 11, 2010, Estep, who was new to GPO at the time, went to Capitol Hill to visit with GPO employees. According to Estep, he saw Perkins sleeping on a chair. Perkins denies that he was asleep. According to Perkins' version of events, Estep knocked on the door to the office, because it was locked, then entered and spent most of the meeting speaking to Orlando Sellers, who shared the office. Pl.'s Opp'n 14. On March 24, 2010, Perkins and his Union Representative met with Estep and Wilson to discuss what happened. Estep and Wilson told Perkins that he would not be disciplined for his conduct, though Perkins claims that their statement was untrue, as his reputation suffered as a result of the accusation.

### 9. Overtime Incident

On February 23, 2011, Perkins was asked to work overtime to complete a project. The next day, Perkins informed Wilson that he was owed an hour of overtime. According to Perkins, Wilson first objected to paying the overtime and then stated that he would call Perkins back. According to Defendant, Wilson then told Perkins that he would receive the overtime, even though he was told that Perkins had been able to finish the job without using overtime. Perkins denies that Wilson told him he would receive any overtime pay.

Approximately a day later, Perkins called Wilson back and accused him of lying and disrespecting him. According to Wilson, Perkins was "loud" and "nasty," though Perkins denies that characterization.

On March 2, 2011, Minter met with Perkins to discuss the incident. At the meeting, Perkins told her that he felt he needed to tell Wilson that he did not trust him. On June 23, 2011, a proposal for suspension was issued. On August 5, 2011, Perkins was issued a letter of suspension. He served his suspension from August 31, 2011, to September 2, 2011.

On January 13, 2011, prior to the overtime incident, Perkins filed his Complaint [Dkt. No. 1]. Perkins alleged one count of "Adverse Employment Actions Taken Against [Him] on the Basis of Retaliation." Compl. 7. On February 22, 2012, Defendant filed her Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. On May 30, 2012, Perkins filed his Opposition [Dkt. No. 20]. On July 27, 2012, Defendant filed her Reply.

## II. Standard of Review

Under Rule 12(b)(1), Plaintiff bears the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction. See Shuler v. U.S., 531 F.3d 930, 932 (D.C. Cir. 2008). In reviewing a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of the factual allegations set forth in the Complaint; however, such allegations

"will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Wilbur v. CIA, 273 F. Supp. 2d 119, 122 (D.D.C. 2003) (citations and quotations omitted). The Court may consider matters outside the pleadings. See Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992). The Court may also rest its decision on its own resolution of disputed facts. Id.

Under Rule 56, summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Ultimately, the court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52. Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

**III. Motion to Dismiss Under Rule 12(b)(1)**

Defendant argues that Perkins' claim relating to the night time pay differential is not a retaliation claim, but is actually a breach of contract claim over which this Court does not have jurisdiction. Def.'s Mot. 9-10. According to Defendant, Perkins is really arguing that GPO violated the 2009 Settlement Agreement, which is a government contract over which only the Court of Federal Claims has jurisdiction. Id.

Defendant is correct that the Tucker Act "vests exclusive jurisdiction in the United States Court of Federal Claims over contract disputes when the United States is a defendant and the amount in controversy exceeds $10,000." Dews-Miller v. Clinton, 707 F. Supp. 2d 28, 46 (D.D.C. 2010) (citing 28 U.S.C. §§ 1346(a)(2), 1491). Further, "[t]he D.C. Circuit and the Federal Circuit recognize that breaches of settlement agreements based on Title VII are 'straightforward contract claims within the purview of the Tucker Act and the jurisdiction of the Court of Federal Claims.'" Allen v. Napolitano, 774 F. Supp. 2d 186, 196 (D.D.C. 2011)

(quoting <u>Greenhill v. Spellings</u>, 482 F.3d 569, 574 (D.C. Cir. 2007)).

Therefore, when "'the primary thrust of [a] complaint is breach of contract . . . , the Claims Court would retain jurisdiction over the suit.'" <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1215 (D.C. Cir. 2006) (quoting <u>Wood v. United States</u>, 961 F.2d 195, 198 (Fed. Cir. 1992)). "Federal courts, however, can exercise jurisdiction over Title VII claims relating to a settlement agreement if the essence of the claims requires interpreting Title VII, not a contract." <u>Allen</u>, 774 F. Supp. 2d at 196 (citing <u>Greenhill</u>, 482 F.3d at 575).

As an initial matter, Perkins fails to address this issue in his Opposition. For this reason alone, his claim for night time pay differential must be dismissed. <u>Hopkins v. Women's Div., Gen. Bd. of Global Ministries</u>, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (citing <u>FDIC v. Bender</u>, 127 F.3d 58, 67-68 (D.C. Cir. 1997))).

Moreover, it is equally clear that "the primary thrust" of Perkins' claim for night time pay differential is contractual in nature, and therefore must be dismissed. <u>Rochon</u>, 438 F.3d at 1215 (internal quotation omitted). Perkins' allegation is

straightforward: "[a]ll of the money due to Mr. Perkins has not yet been paid to him." Compl. ¶ 18. "Failure to carry out obligations under a settlement agreement, however, is the hallmark of a breach of contract claim, not a retaliation claim." Allen, 774 F. Supp. 2d at 196. Indeed, just as in Allen, Perkins "complains that defendant retaliated against [him] by failing to comply with a term of [his] settlement agreement -- a breach of the contract." Id. Therefore, Perkins' claim for night time pay differential must be dismissed for lack of subject matter jurisdiction.

## IV.  Motion for Summary Judgment Under Rule 56

As for his remaining claims, Perkins intertwines theories of retaliation and hostile work environment.[4] See, generally, Pl.'s Opp'n. In response, Defendant contends that his "claims are neither independently actionable as acts of retaliation . . . nor cumulatively rise to the level of severity and pervasive conduct necessary to support a hostile work environment claim." Def.'s Mot. 2-3. Therefore, each theory will be addressed in turn.

---

[4]    Perkins' Opposition also contains a single paragraph with the heading "Actions Taken Against Plaintiff to Create a Hostile Environment Were Motivated by Racial Animus." Pl.'s Opp'n 29 (emphasis added). In this paragraph, Perkins states: "Plaintiff first provides evidence regarding the racial animus motivating the hostile environment created in his workplace." Id. With the exception of this solitary sentence, which contains no record citation, Perkins makes no further claim of racial discrimination. Because he has not put forth any evidence whatsoever regarding racial animus, the Court will treat his claims as relying only on retaliation.

### A.   Retaliation

"Title VII prohibits the federal government from discriminating in employment on grounds of race or sex . . . and from retaliating against employees for engaging in activity protected by Title VII." <u>Montgomery v. Chao</u>, 546 F.3d 703, 706 (D.C. Cir. 2008). "To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." <u>McGrath v. Clinton</u>, 666 F.3d 1377, 1380 (D.C. Cir. 2012).

In this case, the parties do not dispute that Perkins opposed a practice made unlawful by Title VII in the events leading up to the 2009 Settlement Agreement. Therefore, to prove retaliation, he must first show that the given act was a materially adverse employment action. In the discrimination context, "[a]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." <u>Douglas v. Donovan</u>, 559 F.3d 549, 552 (D.C. Cir. 2009). "An employee must 'experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'"

13

Id. (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)). In the retaliation context, however, "actions giving rise to claims are 'not limited to discriminatory actions that affect the terms and conditions of employment,' . . . but reach any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Baird v. Gotbaum, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64, 68 (2006)).

Second, Perkins must show that Defendant "took the action 'because' [he] opposed the practice." McGrath, 666 F.3d at 1380. "In the absence of direct evidence of retaliation," the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), burden-shifting framework applies. McGrath, 666 F.3d at 1383. However, where a defendant has offered a legitimate, non-discriminatory purpose for its adverse actions, consideration of the plaintiff's prima facie case is unnecessary:

> [W]here a defendant 'has asserted a legitimate, non-discriminatory reason for [its action], the district court need not--and should not--decide whether the plaintiff actually made out a prima facie case . . . .' Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, at that point, 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence.' Jones [v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009)] (quoting Carter v. George Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)).

Beckford v. Geithner, 661 F. Supp. 2d 17, 22-23 (D.D.C. 2009).

### 1.   Adverse Employment Action

As explained above, Perkins has offered nine discrete examples of supposedly retaliatory conduct.[5] For eight of these incidents, Perkins has failed to demonstrate any materially adverse employment action. As to (1) the May 7, 2009, Annual Budget distribution; (2) the May 18, 2009, orientation; (3) his assignment to work at the Cannon Building by himself; (4) the supposed humiliation during the receiving clerks meeting; (5) the July 7, 2009, incident regarding failure to obtain a receipt; and (6) the March 11, 2010, "sleeping" incident, Perkins was not subject to any "significant change in employment status," Douglas, 559 F.3d at 552, nor any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Baird, 662 F.3d at 1249. None of these events involved anything more than, at most, verbal reprimands or criticism. Even as Perkins describes the incidents, each of the "discrete episodes seems (at worst) akin to the sort of 'public

---

[5]     In his Opposition, Perkins also raises, for the first time, a claim that he was unfairly denied an annual award that similarly situated co-workers received. Pl.'s Opp'n 13-14. It is settled law in this circuit that a plaintiff may not raise new allegations in this manner. See, e.g., Middlebrooks v. Godwin Corp., 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010) ("[P]laintiff failed to include these allegations in her complaint, and plaintiff may not amend her complaint by the briefs in opposition to a motion to dismiss."); Coll. Sports Council v. GAO, 421 F. Supp. 2d 59, 71 n.16 (D.D.C. 2006) (""[T]he Court does not, and cannot, consider claims first raised in the plaintiff's opposition."). Therefore, the Court will not consider this claim.

humiliation or loss of reputation' that [our Court of Appeals] ha[s] consistently classified as falling below the requirements for an adverse employment action." Id.

Similarly, Perkins suffered no adverse employment action from the June 3, 2009, incident involving Lyndon Ross. Perkins' claim that "[b]y misinforming Plaintiff that Ross was free to visit Capital [sic] Hill and by not informing Plaintiff about Mr. Vines' order to Ross to avoid Perkins, GPO managers intentionally allowed him to remain anxious about Mr. Ross," falls well short of the standard. Pl.'s Opp'n 6. While it is true that "a claim of discriminatory or retaliatory failure to remediate may be sufficient if the uncorrected action would (if it were discriminatory or retaliatory) be of enough significance to qualify as an adverse action (under the relevant standard)," Perkins has not made the necessary showing here. Baird, 662 F.3d at 1249. Perkins himself concedes that GPO made an investigation of the event and that Ross was ordered to stay away from him. See Pl.'s Opp'n 5. Nevertheless, he argues that Defendant purposely allowed him to remain anxious by failing to tell him that Ross was ordered to stay away. Id. 5-6. Simply put, a failure to anticipate and cure his anxiety is not a materially adverse employment action. See Douglas, 559 F.3d at 552; Baird, 662 F.3d at 1249.

Finally, Perkins has failed to show that the letter of warning he received after the October 16, 2009, incident with Marsha

Douglas constitutes an adverse employment action. Letters "contain[ing] no abusive language, but rather job-related constructive criticism, which 'can prompt an employee to improve her performance'" do not suffice to demonstrate a materially adverse employment action. <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1199 (D.C. Cir. 2008). Indeed, as in <u>Baloch</u>, Perkins has pointed to no financial harm or other tangible form of adverse action resulting from the letter. <u>Id.</u>; <u>see</u> <u>also</u> <u>Saunders v. Mills</u>, 842 F. Supp. 2d 284, 294 (D.D.C. 2012). Therefore, Perkins has failed to carry his burden of demonstrating a materially adverse employment action for any of these eight events.

### 2. Inference of Retaliation

The sole remaining event relied upon by Perkins is his suspension based on his argument with Wilson relating to overtime. Defendant does not dispute that he suffered an adverse employment action, but does put forth the legitimate, non-discriminatory reason that Perkins was "suspended . . . for discourteous behavior towards his supervisor." Def.'s Reply 17.

The only question left to answer is "whether a reasonable jury could infer that the proffered legitimate reason was false and that defendant's actions were intended as retaliation." <u>Meadows v. Mukasey</u>, 555 F. Supp. 2d 205, 210 (D.D.C. 2008); <u>see</u> <u>Weber v. Battista</u>, 494 F.3d 179, 186 (D.C. Cir. 2007) (explaining that a plaintiff must prove both conditions to prevail). The court should

consider the totality of the circumstances of the case, relying on "'(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of [retaliation] that may be available to the plaintiff.'" Hampton v. Vilsack, ___F.3d___, No. 11-5194, 2012 WL 2866329, at *3 (D.C. Cir. July 13, 2012) (quoting Waterhouse v. District of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002)); Meadows, 555 F. Supp. 2d at 210. "[I]f [the plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for [retaliation], summary judgment must be entered against [him or her]." Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

"The strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-retaliatory reason for the adverse action." Holmes-Martin v. Sebelius, 693 F. Supp. 2d 141, 152 (D.D.C. 2010). Perkins' prima facie case of a causal connection between his prior EEO activity and the agency's adverse actions is weak. Perkins recites no facts that would suggest that, even if Defendant's proffered reasons are false, the actual motivation for the adverse actions was retaliation for his prior EEO activity.

18

Rather, Perkins concedes that he "did express his mistrust of Mr. Wilson." Pl.'s Statement of Undisputed Material Facts ¶ 83. Although Perkins does deny Defendant's claim that he got "loud" and "nasty," he does not dispute Defendant's assertion that he called Wilson specifically to criticize him and tell him that he did not trust him. Given these concessions, no "reasonable jury could infer that the proffered legitimate reason was false <u>and</u> that defendant's actions were intended as retaliation." <u>Meadows</u>, 555 F. Supp. 2d at 210 (emphasis added).

In sum, Perkins has failed to put forth sufficient evidence to show that Defendant engaged in any retaliatory act.

**B. Hostile Work Environment**

Alternatively, Perkins argues that all of the incidents cited, taken as a whole, demonstrate a hostile work environment. According to him, "[i]t is critical to view the entire gamut of events which Plaintiff offers as evidence of a hostile environment." Pl.'s Opp'n 24.

As with any claim of retaliatory hostile work environment, to prevail, "'a plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Baird</u>, 662 F.3d at 1250 (quoting <u>Baloch</u>, 550 F.3d at 1201); <u>see also</u> <u>Hussain v. Nicholson</u>, 435 F.3d 359, 266 (D.C. Cir. 2006) ("a

hostile work environment can amount to retaliation under Title VII"). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Graham v. Holder, 657 F. Supp. 2d 210, 216 (D.D.C. 2009) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). "These standards ensure that Title VII does not become a 'general civility code,' and are intended to filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Bryant v. Leavitt, 475 F. Supp. 2d 15, 28 (D.D.C. 2008) (quoting Faragher, 524 U.S. at 787).

The conduct described by Perkins does not, as a matter of law, begin to approach the standard for a hostile work environment. Nothing that Perkins has alleged amounts to intimidation, ridicule, or insult. Baird, 662 F.3d at 1250. Rather, construing the facts in the light most favorable to Perkins, each incident resulted, at worst, in either a verbal or written instruction as to how to better conduct himself in the workplace. See, e.g., Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting"). Perkins may well

have had to endure criticism, but he has not articulated anything that approaches the severe or offensive. <u>Graham</u>, 657 F. Supp. 2d at 216; <u>see</u> <u>also</u> <u>Houston v. SecTek, Inc.</u>, 680 F. Supp. 2d 215, 225 (D.D.C. 2010) (finding that comments made with "a belittling tone" and "sarcastic remarks" "failed to satisfy the required elements of [a] racially hostile work environment claim[]."").

In short, Perkins has failed to produce any evidence of conduct so severe or persuasive as "to alter the conditions of [his] employment and create an abusive working environment." <u>Baird</u>, 662 F.3d at 1250 (internal quotation omitted). No jury could reasonably conclude that Perkins has proven, by a preponderance of the evidence, that he was subjected by Defendant to a hostile work environment. Therefore, he has failed to make the necessary showing required to prevail on a hostile work environment claim.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is **granted**. An Order will accompany this Memorandum Opinion.


                                    /s/
August 22, 2012                     Gladys Kessler
                                    United States District Judge


<u>Copies to</u>: attorneys on record via ECF.